IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MT. HEBRON DISTRICT MISSIONARY BAPTIST ASSOCIATION OF AL, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO.: 3:16-cv-658-CDL-GMB [WO] |
| SENTINEL INSURANCE COMPANY, LIMITED, | ) ) ) | |
| Defendant, | ) ) | |
| v. | ) ) | |
| LANDON ALEXANDER, SR., Third-Party Defendant. | ) ) ) | |

## **ORDER**

Before the court is Third-Party Defendant Landon Alexander, Sr.'s Motion to Disqualify Counsel (Doc. 87), which seeks the disqualification of counsel for Plaintiff Mt. Hebron District Missionary Baptist Association of Alabama, Inc. ("Mt. Hebron"). Mt. Hebron has responded in opposition to the motion (Docs. 90 & 92), Alexander has filed a reply in support (Doc. 91), and the parties were heard on the motion during a telephonic hearing on August 3, 2017. For the reasons stated below, and after careful review of the parties' submissions and the applicable law, it is ORDERED that the motion (Doc. 87) is GRANTED and that the law firm of Funderburk & Lane is disqualified from the representation of Mt. Hebron in this lawsuit.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The early procedural history of this litigation is set out in the court's Report and Recommendation of March 16, 2017 (Doc. 76). For present purposes, the core dispute is whether Alexander is a proper recipient of the proceeds of an insurance policy issued by Sentinel Insurance Company, Limited ("Sentinel") for a church building operated by Mt. Hebron until a tornado destroyed it. Doc. 11. The operative complaints are Mt. Hebron's First Amended Complaint (Doc. 11), Mt. Hebron's Third-Party Complaint against Alexander (Doc. 34), and Sentinel's Complaint in Interpleader (Doc. 24). Sentinel interpleaded the proceeds from the insurance policy, and the interpleader action will be resolved before addressing the underlying claims, counterclaims, and third-party claims. *See, e.g.*, Docs. 83 & 89.

However, one roadblock stands in the way of the orderly resolution of the interpleader action: Alexander insists that he consulted with Attorney Kenneth Funderburk of the law firm of Funderburk & Lane about this very matter in 2015. Doc. 87-1. Funderburk nevertheless undertook the representation on behalf of Mt. Hebron. Alexander raised this potential conflict of interest with Funderburk no later than December 2016. Doc. 87-4 at 5. Funderburk does not acknowledge a conflict of interest and has refused to withdraw voluntarily from the representation. As a result, Alexander filed the instant motion on June 27, 2017. Doc. 87.

Alexander and Funderburk agree on certain of the operative facts. They agree that

they met at Funderburk's law office on at least two occasions[1] during 2015. Docs. 87-1 at ¶ 9 & 90-1 at ¶ 5–9. One meeting occurred on May 5, 2015, and another on June 16, 2015. Docs. 87-1 at ¶ 9 & 90-1 at ¶ 5 & 9. Alexander paid Funderburk $50 by check for the meeting in May and $75 by check for the meeting in June, with both checks drawn on an account held in Alexander's name. Docs. 87-1 at ¶ 9 & 90-1 at ¶ 5 & 9. The memorandum line for Alexander's checks indicated, respectively, that the payments were for a "Consultation fee" and a "lawyer." Docs. 87-2 & 87-3. Funderburk negotiated both checks and has not refunded the fees. *See* Docs. 87-2 & 87-3. This is consistent with Funderburk's general practice for consultations in that he customarily charges a consultation fee, which covers about fifteen minutes of his time. Doc. 90-1 at ¶ 3, 5 & 9.

Around the time of these meetings, Alexander left a number of documents at the offices of Funderburk & Lane for Funderburk's review, including an invoice from Alexander to the "Mount Hebron District Association Center" for "a loan that is being paid with no interest or labor fee," which described the terms of the loan and characterized Alexander as the "mortgage holder"; a copy of the warranty deed for the Mt. Hebron property; and a copy of the Mt. Hebron by-laws, which include the provision that the building may not be sold without paying Alexander or his heirs the sum of $200,000. Doc. 90-11. Funderburk kept these documents in a filing cabinet and he does not recall reviewing them. Doc. 90-1 at ¶ 13.

While Funderburk and Alexander agree on these basic facts, otherwise the substance

---

[1] Alexander remembers an additional meeting in April or early May 2015 that Funderburk does not recall. Docs. 87-1 at ¶ 6 & 90-1.

of their meetings is largely in dispute. Alexander claims that he constructed Mt. Hebron's building under an agreement that his expenses and labor would serve as an interest-free loan to Mt. Hebron. Doc. 87-1 at ¶ 2–3. Mt. Hebron had not fully reimbursed him by early 2015, and Alexander's purpose in seeing Funderburk was to seek his legal advice on how to get Mt. Hebron to make good on the loan. Doc. 87-1 at ¶ 5–6. During their meetings, Alexander told Funderburk that he wanted to be recognized as a mortgagee on the property, described the facts underlying the dispute, and shared his communications with Mt. Hebron officials. Doc. 87-1 at ¶ 7. He asked Funderburk how to memorialize his interest in the property and ultimately requested that Funderburk draw up the documentation to do so. Doc. 87-1 at ¶ 7. Funderburk reviewed Alexander's documents and gave his initial opinion that Alexander has a "good case" for reimbursement, but later reversed course and said that it would be difficult to get Mt. Hebron to repay the loan. Doc. 87-1 at ¶ 8 & 11.

Funderburk remembers the meetings differently. For many decades, Funderburk has served as an attorney for a number of religious organizations in and around Russell County, Alabama, including Mt. Hebron. Doc. 90-1 at ¶ 6. When he agreed to take a meeting with Alexander in May 2015, Funderburk believed that Alexander was a member of a prominent family associated with Mt. Hebron. Doc. 90-1 at ¶ 6. However, as soon as he saw Alexander, Funderburk realized that he was mistaken and he did not know Alexander. Doc. 90-1 at ¶ 6. He took the May 5 meeting with Alexander anyway, and by the end of the meeting Funderburk understood that Alexander was "seeking [his] advice" on an "ongoing disagreement between [Alexander] and the other board members of Mt. Hebron." Doc. 90-1 at ¶ 8. Funderburk does not recall the specific details of that dispute,

but maintains that he and Alexander did not talk about Alexander's request to memorialize a debt or to have himself listed as a mortgagee, or the need for Funderburk's assistance in drafting documents to accomplish these goals. Doc. 90-1 at ¶ 7.

Funderburk took the June 16 meeting understanding it to be following up on Alexander's disagreement with the Mt. Hebron board members. Doc. 90-1 at ¶ 9. During the meeting, Alexander referred to a debt owed to him by Mt. Hebron. Doc. 90-1 at ¶ 11. It eventually became apparent to Funderburk that Alexander's interests were adverse to Mt. Hebron's, and as a result Funderburk told Alexander that he would not represent him. Doc. 90-1 at ¶ 11.

Until that time, Alexander believed that Funderburk was already serving as his attorney. Doc. 87-1 at ¶ 12. He had not been told to restrict or limit his discussion of the dispute with Mt. Hebron or the facts leading it. Doc. 87-1 at ¶ 12. Funderburk had not mentioned that he was meeting with Alexander in his capacity as a lawyer for Mt. Hebron. Doc. 87-1 at ¶ 12.[2] As a result, Alexander assumed he could speak honestly and freely with Funderburk and that his communications would be kept in confidence. Doc. 87-1 at ¶ 13. He would not have consulted Funderburk on these issues if he had known that Funderburk would represent Mt. Hebron in this lawsuit. Doc. 87-1 at ¶ 13.[3]

## II. DISCUSSION

On the whole, lawyers hold themselves to high standards of candor and fair dealing.

---

[2] In fact, even when Funderburk refused to represent Alexander, he did not explain that this decision related to his representation of Mt. Hebron. Docs. 87-1 at ¶ 11 & 90-1 at ¶ 11.
[3] While their accounts of the meetings diverge on other matters, the facts in this paragraph are established by Alexander's affidavit testimony and are not contradicted by Funderburk.

5

Occasionally, however, when the lawyers do not police themselves, the court must exercise its inherent authority to discipline them as officers of the court. *E.g.*, *In re Snyder*, 472 U.S. 634, 643 (1985) ("Th[e] inherent power [to discipline lawyers] derives from the lawyer's role as an officer of the court which granted admission.") (citing *Theard v. United States*, 354 U.S. 278, 281 (1957)). This is, unfortunately, one of those occasions in which the court "is obligated to take measures against unethical conduct." *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976). The Middle District of Alabama's local rules charge the district's judges with insuring that the lawyers appearing before this court avoid misconduct in all forms, including violations of the Alabama Rules of Professional Conduct. M.D. Ala. LR 83.1(g) & (h). For the reasons set out below, the court concludes that Funderburk & Lane would, if allowed to continue in their representation of Mt. Hebron in this action, run afoul of Alabama Rules of Professional Conduct 1.9 and 1.10.

Rule 1.9(a) of the Alabama Rules of Professional Conduct prohibits an attorney "who has formerly represented a client in a matter" from "represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after consultation." Ala. R.P.C. 1.9(a). Alexander does not consent to Funderburk's representation of Mt. Hebron, and therefore the court must ask whether Alexander has carried his burden of proving that Rule 1.9(a) applies to the circumstances presented here. *See O'Rear v. City of Carbon Hill*, 2015 WL 5286140, at *3 (N.D. Ala. Sept. 8, 2015) ("'The party moving for an attorney's disqualification under . . . Rule 1.9 bears the burden of proving the existence of a conflict of interest.'") (quoting *Ex parte Tiffin*, 879 So. 2d

1160, 1164 (Ala. 2003)). The court concludes that Alexander has carried that burden by introducing evidence sufficient to prove Rule 1.9(a)'s applicability.

Rule 1.9(a) "is generally a codification of the standard articulated in the landmark case of *T.C. Theatre Corp.*" *Green v. Montgomery Cty., Ala.*, 784 F. Supp. 841, 843 (M.D. Ala. 1992) (citing *T.C. Theatre Corp. v. Warner Bros. Pics.*, 113 F. Supp. 265 (S.D.N.Y. 1953)). "Under Rule 1.9(a) and *T.C. Theatre* . . . a party may obtain disqualification of the opposing counsel if he can show that (1) he had an attorney-client relationship with the attorney sought to be disqualified (2) in a substantially related matter." *Green*, 784 F. Supp. at 843. If both prongs are satisfied, the party seeking disqualification is "entitled to an irrebuttable presumption that 'during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.'" *O'Rear*, 2015 WL 5286140, at *3 (quoting *T.C. Theatre Corp.*, 113 F. Supp. at 269). This presumption shields the attorney from being compelled to disclose attorney-client communications that would undercut his or her fundamental duty of confidentiality. *Green*, 784 F. Supp. at 844.

Funderburk argues that he did not have an attorney-client relationship with Alexander because he only met with Alexander on two occasions and, at the end of the second meeting, informed Alexander that he would not represent him. Docs. 90 at 2 & 90-1. But an attorney-client relationship may exist long before a client formally retains his chosen attorney. In fact, a fiduciary relationship "'extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result.'" *Green*, 784 F. Supp. at 845 (quoting *Westinghouse Electric Corp. v.*

7

*Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978), *cert. denied*, 439 U.S. 955 (1978)). For that reason, the "'existence of an express contract of employment, or the payment of legal fees, or the length of the consultation is not determinative' of the establishment of a lawyer-client relationship." *Cochran v. Five Points Temporaries, LLC*, 2012 WL 4726285, at *4 (N.D. Ala. Sept. 27, 2012) (quoting *Green*, 784 F. Supp. at 845). Instead,

> the test for determining the existence of this fiduciary relationship is a subjective one and "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice." This subjective belief must, however, be a reasonable one. If, for example, the attorney has made it clear to the would-be client that there is no attorney-client relationship and if the evidence further reflects that the would-be client should have known that the relationship had not advanced to the point at which it could be deemed a representation, then there would be no attorney-client relationship despite the would-be client's subjective belief.

*Green*, 784 F. Supp. at 845–46 (quoting *Westinghouse Electric Corp.*, 580 F.2d at 1319, and citing *Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 HARV. L. REV. 1244, 1322–23 (1981)).

Alexander has carried his burden of proving that he subjectively believed he was consulting a lawyer for the purpose of obtaining legal advice. *See, e.g.*, Docs. 87-1 at ¶ 12 & 90-1 at ¶ 8 (acknowledging that Alexander was seeking Funderburk's advice on the dispute). The totality of the circumstances likewise establishes that Alexander's belief was a reasonable one. *Green* is particularly instructive in this regard. The attorney-client relationship in *Green* arose out of one phone call several months before the lawsuit. *Green*, 784 F. Supp. at 845. During that call, the client did not mention the opposing party by name, but he "conveyed certain details and outlined the facts of his situation in general

8

terms." *Id.* Upon hearing the facts, the attorney gave his opinion that the case had little merit but never communicated that he represented the opposing party. *Id.* As a result, the client believed he could be open and honest with the attorney during the phone call. *Id.* The client did not, however, retain the attorney for the resulting lawsuit, and sought the disqualification of his law firm when another member appeared on behalf of the opposing party. *Id.* The *Green* court held that the client had a reasonable expectation that his communications would be kept confidential, and disqualified the attorney's firm from representing the opposing party on that basis. *Id.* at 847.

There is little daylight between the facts of *Green* and those here—and the distinctions merely underscore the reasonableness of Alexander's belief in an attorney-client relationship. Alexander and Funderburk had at least two in-person meetings, not just a phone call. Even Funderburk acknowledges that from the very first meeting he understood that Alexander was seeking his advice related to an "ongoing disagreement" among Alexander and the "other board members of Mt. Hebron." Doc. 90-1 at ¶ 8. This is more than enough for the court to conclude that Alexander conveyed the general scope of the dispute to Funderburk. And unlike in *Green*, Alexander disclosed the name of the opposing party. Even so, Funderburk never warned Alexander about the potential conflict. Funderburk knew he had represented Mt. Hebron in the past. And from the moment he saw Alexander, he knew that Alexander was not someone he knew from his previous work with Mt. Hebron. He could have spoken up then, but there is no evidence in the record that Funderburk, despite himself being well aware of the Mt. Hebron relationship, took any steps to "ma[k]e it clear to the would-be client that there is no attorney-client relationship."

*Green*, 784 F. Supp. at 846. On these facts, the court concludes that Alexander's subjective belief that his communications were confidential is a reasonable one. And while "not determinative," *id.* at 845, Alexander's payment of legal fees to Funderburk for each meeting—which Funderburk willingly accepted—buttresses this conclusion.

Having found the existence of an attorney-client relationship, the court turns to the question of whether Funderburk's prior representation of Alexander is substantially related to the instant matter. "'The substantial relationship test is the keystone of the law on conflicts of interests involving former clients.'" *Cochran*, 2012 WL 4726285, at *12 (quoting *Ex parte Regions Bank*, 914 So. 2d 843, 848 (Ala. 2005)). To determine whether matters are substantially related, the court considers "the similarity between the factual situations, the legal issues posed, and the nature and extent of the attorney's involvement to see if information from the prior representation is material to the new representation." *Id.* In this respect, the commentary to Alabama Rule of Professional Conduct 1.9 distinguishes between lawyers who are "directly involved in a specific transaction"—for whom "subsequent representation of other clients with materially adverse interests clearly is prohibited"—and those who take on an adverse representation relating to a "wholly distinct problem." Ala. R.P.C. 1.9, comment; *see also Cochran*, 2012 WL 4726285, at *12 (quoting this commentary).

Alexander's uncontroverted affidavit testimony establishes that his purpose in seeking out Funderburk was to obtain legal advice on how to be repaid for his construction loan to Mt. Hebron. Doc. 87-1 at ¶ 5–6. This is functionally the same dispute now before the court—and certainly a substantially related matter involving two of the same parties,

many of the same operative facts, and overlapping legal issues. Of course, the dispute has been complicated by the intervening destruction of the building, but the documents Alexander shared with Funderburk confirm that, then as now, Alexander's goal has been to enforce his claim that he extended a construction loan to Mt. Herbron that remains outstanding. *See, e.g.*, Doc. 90-11 at 2–3 ("This a loan that is being paid with no interest or labor fee. . . . I am the mortgage holder."). Alexander may not have discussed every underlying fact with Funderburk during their face-to-face consultations, but this hardly means that the disputes are wholly distinct problems.

Funderburk defends his actions by oversimplifying this lawsuit. To that end, he characterizes "the only matter before the Court with regard to Dr. Alexander" to be "whether or not Dr. Alexander was the insured under the subject insurance policy." Doc. 90 at 8. Framing the dispute this way allows Funderburk to claim that the events giving rise to this lawsuit "began well after Dr. Alexander ever consulted with [me]." Doc. 90 at 12. But the substantial-relationship test is not so narrow. As noted above, it focuses on the similarity between the "factual situations" and "legal issues posed." *Cochran*, 2012 WL 4726285, at *12. Alexander's intent, when he originally consulted Funderburk, was to get legal advice on how to make sure Mt. Hebron paid him back for the construction loan. *See* Doc. 87-1 at ¶ 5–6. He disclosed to Funderburk—whether in person or through the documents he left at his office—that the loan related to Mt. Hebron's building, that there was an ongoing dispute with Mt. Hebron's board of directors over the loan, that in at least some documents he was designated as a "mortgage holder," and that Mt. Hebron's right to use the property may be encumbered by a $200,000 debt in his favor. *See* Doc. 90-11.

11

Undeniably, these facts are relevant and material to the matter now under dispute. And they are not merely tangential, but actually impact the core issue in the lawsuit. Even Mt. Hebron's third-party complaint explicitly confirms the link between Alexander's earlier claim of an interest in the property and his current claim for the insurance proceeds. *See, e.g.*, Doc. 34 at 2 (alleging that Alexander "knew, or should have known, that he had no Mortgage on the property and that wrongfully asserting his false claim interfered with the payment of the loss by the responsible Insurance Company to Plaintiff"). The evidence before the court is that Alexander provided Funderburk information and documents relating to Alexander's interest in the property and directly bearing on whether he is a rightful mortgage holder. Mt. Hebron's wrongful-interference claim in this lawsuit depends on disproving that very interest. This, alone, makes the disputes substantially related.

Funderburk's remaining argument against Rule 1.9(a) disqualification is largely beside the point. He maintains that "Alexander did not divulge any information to me that could be considered confidential or adverse to him in this proceeding," but this ignores both the relevant law and the practical realities of the attorney-client relationship. Doc. 90-1 at ¶ 8; *see also* Doc. 92 at 6 ("[T]here is no claim by [Alexander] that he provided Mr. Funderburk with any information that would or could be adverse to him in this interpleader action."). From a legal standpoint, the presumption is irrebutable that a client has shared confidential communications where the requirements for Rule 1.9(a) have been met. Under these dicrumstances, the court "will not inquire into whether the former client in fact made confidential disclosures to the attorney or whether the attorney is 'in fact likely to use the damaging disclosures to the detriment of his former client.'" *Green*, 784 F. Supp. at 844

(quoting *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir. 1977)). The court declines Funderburk's invitation to engage in just that inquiry.

Practically speaking, this dispute was entirely preventable. Funderburk, an experienced lawyer, was "in the best position to develop mechanisms to avoid ethical dilemmas, that is, conflicts with potential as well as existing clients." *Green*, 784 F. Supp. at 846. He was the "repeat player" who "knows the ethical rules [and] has the legal background enabling him to anticipate the possible scenarios." *Id.* (citations and quotations marks omitted). Yet the record does not reflect that Funderburk took any meaningful steps to limit the scope of his consultations with Alexander before he ascertained whether a conflict might exist or otherwise employed an appropriate screening process that might have avoided the conflict. *See id.* (citing American Bar Association Formal Ethics Opinion No. 90–358 (1990)); *In re Employment Discrim. Litig. Against Ala.*, 453 F. Supp. 2d 1323, 1336 (M.D. Ala. 2001). The moment Funderburk saw Alexander on May 5, 2015, he realized that Alexander was not someone who had previously sought his counsel on matters related to Mt. Hebron. When Alexander then asked for advice on a dispute with Mt. Hebron and its board of directors, the prudent response would have been to inform Alexander of Funderburk's prior representation of Mt. Hebron. Instead, Funderburk finished that meeting, cashed the check for his time, allowed a second meeting a few weeks later, and waited until the end of that second meeting to raise the issue in any way. This

13

was simply too little and too late to screen for the conflict.[4]

Finally, the court concludes that Funderburk's conflict taints his entire firm. Alabama Rule of Professional Conduct 1.10(a) provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any of them, practicing alone, would be prohibited from doing so by [Rule 1.9]." Ala. R.P.C. 1.10(a). "Rule 1.10(a) is based on the idea that 'a firm of lawyers is essentially one lawyer for the purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom he is associated.'" *Green*, 784 F. Supp. at 843 (quoting Ala. R.P.C. 1.10, comment). Funderburk apparently concedes this point. At any rate, the court finds that Funderburk's conflict is imputed to his entire firm, compelling the disqualification of all members or associates of Funderburk & Lane from the representation of Mt. Hebron in this action.[5]

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that Third-Party Defendant Landon Alexander, Sr.'s Motion to Disqualify Counsel (Doc. 87) is GRANTED, and the law firm

---

[4] The court does not reach this conclusion lightly and is aware of the impact of the disqualification on Mt. Hebron, which is deprived of its right to choose the attorneys who will represent it in this action without the court's interference. *See, e.g.*, *Hershewe v. Givens*, 89 F. Supp. 3d 1288, 1291 (M.D. Ala. 2015) (discussing the impact of forced disqualification and concluding that "the moving party has a high burden to prove that disqualification is absolutely necessary); *In re Empl. Discr. Litig. Against Ala.*, 453 F. Supp. 2d at 1331 noting that "disqualification is always a drastic measure"). However, on balance, the relatively early stage of these proceedings, Funderburk's opportunity to avoid this conflict or at least to minimize any prejudice to Alexander, and the public's interest in the integrity and validity of the judicial process weigh in favor of disqualification. *See Green*, 874 F. Supp. at 849 (addressing similar equitable considerations).

[5] The court's finding that Funderburk & Lane is disqualified pursuant to Rule 1.9(a) obviates any need to discuss Rule 1.9(b), relating to the use of confidential information to the disadvantage of a former client, which has been addressed by Mt. Hebron, Doc. 90 at 13, even if Alexander did not expressly predicate his motion on this subsection of Rule 1.9.

of Funderburk & Lane is disqualified from the representation of the Mt. Hebron District Missionary Baptist Association of Alabama, Inc. in this lawsuit.

It is further ORDERED that the Mt. Hebron District Missionary Baptist Association of Alabama, Inc. shall retain new counsel and its new counsel shall file a notice of appearance no later than **September 28, 2017.** In as much as this party may not represent itself *pro se* in this litigation, the failure to retain new counsel within the deadline set by the court will be treated as an abandonment of this action and may result in the dismissal of claims or other dispositive orders.[6]

DONE on the 7th day of September, 2017.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[6] The court notes that two other motions remain pending at this time. *See* Docs. 94 & 97. These motions will be resolved, and any appropriate briefing orders entered, after the appearance of Mt. Hebron's new counsel.